## CIRCUIT COURT OF ACCOMACK COUNTY

Agnes Brittingham Willard,
Individually and as Administrator
c.t.a. of the Estate of
Marjorie R. Russell, deceased

    v.

Juanita R. Dobson et al.

March 19, 1986

Case No. (Chancery) 8433

By JUDGE H. CALVIN SPAIN

This matter came on to be heard in the Circuit Court for the County of Accomack on January 16, 1986, upon the Complainant's suit for aid and direction with respect to the distribution of certain assets from the Estate of Marjorie R. Russell, deceased.

The said Marjorie R. Russell (hereinafter called "Russell"), a lady of considerable intelligence and substantial assets, died testate on May 26, 1985, leaving a Last Will and Testament dated May 7, 1964, together with an attached codicil dated December 13, 1973. The Court is concerned with the interpretation of one paragraph from the Last Will and Testament dated May 7, 1964, to-wit:

> First: I give and bequeath to my nieces, Agnes Brittingham Willard and Henrietta Taylor, equally that money found in an envelope on which their names are written, which envelope will be either in my safe or my safety deposit box. I likewise give and bequeath to my great niece, Marjorie Willard Duer, the money found in an envelope whereupon her name is written, likewise to be found in my safe or safety deposit box.

Stated simply, upon the death of Russell, envelopes were found as described in the aforementioned paragraph. However, the *nature* of the contents of or the lack thereof, in each, has created two issues that must be decided.

### I. *Does the Term "Money" Include Securities When Used in a Last Will and Testament?*

As described in the Law Will and Testament of Russell, an envelope was duly found with the name of Marjorie Willard Duer upon the same. The envelope had the testatrix's printed return address and in the handwriting of Russell, the following: "For Marjorie Willard Duer." Examination of the envelope disclosed that its contents did not consist of "cash," as might be anticipated from the ordinary use of the word "money," but, instead, a number of stock certificates in the name of the deceased. For purposes of this opinion, it is unnecessary to enumerate the stock certificates with further particularity.

Russell's Last Will and Testament was drawn by the law firm of Mapp and Mapp and included several paragraphs that, among other things, dealt with the specific bequests which are the subject of this litigation, personal property and a residuary clause. The Codicil contained several paragraphs dealing with real property, personal property, and certain considerations with respect to the administration, expenses and taxes relating to her estate.

Suffice it to say, the law in Virginia in dealing with this particular subject is not extensive. Counsel have cited the few cases existing in the Commonwealth of Virginia, starting with *Dabney* v. *Cottrell's, Administrator*, 50 Va. (9 Gratt.) 572 (1853), through *Warner* v. *Baylor*, 204 Va. 867 (1964). Numerous foreign citations have also been provided for the Court's perusal. In addition, the Court has researched the question in other publications. None of the cases, either from the Commonwealth of Virginia or foreign jurisdictions, are particularly helpful. Different factual circumstances, will construction, and the peculiarities of the law in the various jurisdictions prevent a clear determination of the issue.

Russell's Last Will and Testament contains a residuary clause. Neither the Codicil nor the Last Will and Testament provides a specific bequest to anyone of any sum of money

in "cash." The codicil did provide one beneficiary with an opportunity to purchase a certain parcel of property for a specified sum, but that is not a specific bequest in "cash" insofar as the court is concerned.

In the normal and ordinary use of the word "money," one would presume that a testatrix would be disposing of "cash/dollars and cents." Numerous exceptions, from this ordinary interpretation of the word "money," may be found in the various cases studied by the Court. None are decisive in this particular case.

The Court finds that the Last Will and Testament, together with the attached Codicil of Russell, does not contain any bequests involving "cash" or, in layman's language, dollars and cents, except through the operation of the residuary clause. Russell had ample opportunity in the Last Will and Testament and in the Codicil to make specific bequests with respect to "cash," as used in this opinion. With respect to both issues presented in this case, the second of which will be discussed in depth hereinafter, Russell chose the word "money" to describe the items of value to be found in two different envelopes. The Court notes that Russell chose to include items other than U.S. Currency.

The Court, thus, must rely upon general principles of law in determining the issue of the meaning of "money" as used in the Last Will and Testament of Russell. It would appear that the most appropriate principle to be applied in this particular case is found in *Baptist Home v. Mizell, Adm'r*, 197 Va. 399, 404 (1955), to wit: "[N]o absolute technical meaning may be ascribed to the word 'money' in a will, and its meaning in every case must depend upon the context and surrounding circumstances proper to be considered." Considering the stipulated evidence (documentation) presented in this case, the oral testimony of the witnesses, and the law as applicable to this particular issue, the Court accordingly finds that it was the testatrix's intent that the term "money," as used in her Last Will and Testament, together with attached Codicil, included securities, to wit: the stock certificates found in the envelope as described "For Marjorie Willard Duer." Hence, the stock certificates are to be disbursed to Marjorie Willard Duer.

## II. *What Constitutes a Contract Between a Depositor and a Financial Institution?*

As provided in paragraph "First" of Russell's last will and testament, an envelope was duly found with the names of Agnes Willard and Henrietta Taylor upon the same. The envelope contained the engraved return address of Russell and in the handwriting of Russell "For Agnes Willard and Henrietta Taylor." Pursuant to paragraph "First" of the Last Will and Testament "money" was to be in the envelope. Instead, *nothing* was found. However, certificates of deposit were found in her safe. Certain certificates passed by other means and are not the subject of this opinion. Only one certificate, in the sum of $19,933.78, is in dispute. That particular certificate is in the sole name of Russell.

The facts surrounding this particular issue are rather novel and involve incredibly sloppy business practices. The decedent, Russell, from time to time, was the owner of certain certificates of deposit issued by Shore Savings and Loan Association. The evidence is in conflict, but apparently Russell opened an account with Shore Savings and Loan Association sometime prior to 1970. The evidence indicates that Shore Savings and Loan has in its records only one account/signature card with respect to the transactions involving the decedent. The evidence indicates considerable confusion and lack of designation with respect to account numbers and certificate numbers. That thicket of problems does not have to be breached in order to reach a decision in this matter.

The evidence would indicate that the account/signature card introduced into evidence was executed by Russell as early as February 20, 1970. It further indicates that on June 28, 1972, Russell added "and payable on death equally, to Henrietta Taylor, niece, Agnes Willard, niece." That addition was in the handwriting of Russell, duly dated and initialed.

The undisputed evidence is that, no matter how many "accounts" may have existed, the savings and loan chose to use only one account/signature card, which card, duly modified, provided for payment of funds, on death, to certain beneficiaries. Additionally, the evidence shows that from time to time, certificates of deposit were "rolled over" and "new funds" were added. The account/signature card shows that various account numbers and/or

certificate numbers were delineated thereon and deleted
thereon, from time to time, as the account numbers and
certificate numbers changed.

The problem creating the issue to be decided by
the Court occurred on January 6, 1975. At that time,
Shore Savings and Loan issued a savings payment slip
to Marjorie R. Russell for the sum of $20,000 bearing
account number FM-14 (now T-1569). In a manner as predict-
able as the proverbial groundhog, Shore Savings and Loan
added account number FM-14 to the one and only existing
account/signature card. The evidence indicated that the
deposit into Russell's account at Shore Savings and Loan
Association, whatever the number, on January 6, 1975,
was made by Agnes Brittingham Willard for Russell. There
was some question as to whether Mrs. Russell may. have
been present at the time the deposit was made. The deposit
was received by Colon Snyder who was the managing officer
for Shore Savings and Loan for 22 years. At that time,
January 6, 1975, Mr. Snyder testified that he received
no instructions with respect to the deposit as to whether
it was to be payable on death or not to be payable on
death. He further testified that insurance regulations
required separate signature cards for each account, i.e.
each certificate issued by the savings and loan. Whether
Russell was present; whether it was inconvenient for
Russell to come to the savings and loan office; or whether
an additional signature card was provided to Agnes Brit-
tingham Willard to obtain the signature of Mrs. Russell,
the undisputed facts are that Mr. Snyder never received
instructions from anyone with respect to payment on death
and the January 6, 1975, deposit. Mr. Snyder instructed
Robin Kellam, a vice president of Shore Savings and Loan
for some 15 years, to add account/certificate number
FM-14 to the one and only existing account/signature
card. He further instructed her to write thereon "not
p.o.d." The pertinent entry was made in *red ink*.

Mr. Snyder admitted, in his testimony, that when
accepting the deposit for FM-14 he made a mistake by
not getting a separate card. Therein lies the problem!

Shore Savings and Loan Association *unilaterally*
decided to use the one and only existing account/signature
card to govern its contractual relationship with Russell
in respect to all account/certificate numbers. Hence,
several collateral questions are raised.

The following Code provisions are useful in resolving the issue at hand:

Section 6.1-125.1(1): *"Account"* means a contract of deposit of funds between a depositor and a financial institution;

Section 6.1-125.1(10): *"P.O.D. account"* means an account payable on request to one person during lifetime and on his death to one or more P.O.D. payees, or to one or more persons during their lifetime and on the death of all of them to one or more P.O.D. payees;

Section 6.1-125.3(B)(2): On the death of the sole original payee. . . any sums remaining on deposit belong to the P.O.D. payee. . . surviving.

Section 6.1-125.6: The provisions of Section 6.1-125.5 of the Code of Virginia as to the rights of survivorship are determined by the form of the account at the death of a party. This form may be altered by written order given by a party to the financial institution to change the form of the account or to stop a payment under the terms of the account.

Cutting through the maze of paper work and nomenclature used to describe the various transactions between Russell and Shore Savings and Loan, certain conclusions can be reached.

1. "Account" as used in the Code of Virginia does not require that a contract be in writing.

2. The use of an account/signature card would create an express contract.

3. In the absence of an account/signature card, an implied contract would exist between Russell and Shore Savings and Loan.

4. The financial institution has confused apples, oranges, and pears. The money market certificate in question bears a number, which number is used variously as an account and certificate number. The account/signature card bears a designation "Account No." as does the money market certificate. It was a misnomer to refer to the

various numbers as "certificate numbers." All of the certificates bore different account numbers and the effort of the financial institution to contort one account/signature card into a multifaceted contract, without express language referring to account numbers and certificate numbers was utterly without effect.

The Court finds that Shore Savings and Loan Association was without authority to unilaterally use the one and only existing account/signature card as "the contract" between Russell and Shore Savings and Loan with respect to the January 6, 1975, deposit. Its unilateral use of the card, whether "P.O.D." or not "P.O.D." is totally improper. While it is not necessary to decide what is now a moot issue, the court questions whether there was an express contract with Russell with respect to any certificates that were rolled over after 1972.

Without an express contract, the code provisions concerning "P.O.D." are nonoperative.

Consequently, the Court finds that money market certificate numbered T-1569, issued on June 15, 1981, formerly designated as "FM-14," does not pass upon death to Henrietta Taylor and Agnes Willard pursuant to any account/signature card that may exist in the files of Shore Savings and Loan Association. The money market certificate is found to be an asset of the Estate for distribution pursuant to the residuary clause contained in the Last Will and Testament.

Since the certificate was not found in the envelope as mentioned in the Last Will and Testament, the question is moot as to whether the proceeds would have passed to the beneficiaries following the logic of the Court as used in the first issue decided in this opinion.